## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
### (Kansas City Docket)

UNITED STATES OF AMERICA

               **Plaintiff,**

  **v.**

JAMES MOORE,
STEPHANIE LUNDE,
ERIC JOHNSON,

                 **and**

HELEN JONES,

               **Defendants.**

**Case No.**  16-20112-CM/JPO

### INDICTMENT

The Grand Jury charges:

Background

At all times material to this indictment:

*Defendants*

1.      Defendant James Moore founded Instant Access Group in the United Kingdom in 2002 and was its chairman.  He was a limited partner with conspirators, known to the grand jury, in Lake Austin Properties I, Ltd., in the Orlando, Florida area, through offshore companies that he owned or controlled.

2.      Defendant Stephanie Lunde was senior vice president for credit administration at Marshall Group and senior vice president for credit approval group at BankFirst in Minneapolis, Minnesota.

3.      Defendant Eric Johnson was vice president and loan underwriter at BankFirst in Lake Mary, Florida.  He managed other employees at BankFirst.  He was the relationship

manager for Lake Austin Properties I, Ltd. and acted as loan underwriter for Lake Austin

Properties I, Ltd. construction loans.

4.    Defendant Helen Jones served as vice president of sales at Maesbury Homes, Inc.,

and vice president of sales at Lake Austin Properties I, Ltd.  As vice president of sales, she

communicated with property buyers in sending correspondence and answering questions.

*Entities*

5.    Maesbury Homes, Inc. (Maesbury Homes) was a Florida corporation owned

jointly by conspirators known to the grand jury.  This was a commercial and residential real

estate development company that operated in the Orlando, Florida area.  It had bank accounts

with Mercantile Bank in the Orlando area and those accounts were used to deposit more than

$100 million of buyer down payments for Lake Austin Properties I, Ltd.

6.    Lake Austin Properties I, Ltd. (Lake Austin) was a Florida limited partnership

comprised of other entities owned and controlled by defendant James Moore and conspirators,

known to the grand jury.  Lake Austin was the borrower and developer of five resort

communities on adjacent land identified as Palisades (Parcel A), Avalon Resort (Parcel B),

Grande Palisades (Parcel C), Magnolia Woods (Parcel D), and Twin Lakes (Parcel E) in the

Orlando area.  These five parcels were jointly referred to as Lake Austin Resort.

7.    Palisades was a 99-unit condominium resort community with building

construction that commenced in July 2006.  BankFirst originated a construction loan of

approximately $47 million to Lake Austin in 2006.  This loan was partially secured by a

mortgage on Parcel C.  Buyer down payments for Palisades units were deposited into the

Maesbury Homes account at Mercantile Bank.  Lake Austin purported that Palisades was

completely pre-sold before the loan was issued.

2

8.      Grande Palisades was a multi-tower 890-unit condominium resort community with vertical construction that commenced in 2007.  BankFirst originated a $228 million revolving condominium construction loan to Lake Austin in 2007 with a maximum funded amount not to exceed $140 million.  Lake Austin was required to provide $75 million in borrower equity as a condition of the loan.  BankFirst participated 100% of this loan to approximately 68 financial institutions throughout the United States, which included Columbian Bank & Trust in Topeka, Kansas, and First National Bank & Trust Company in Larned, Kansas. Buyer down payments for Grande Palisades units were deposited into the Maesbury Homes account at Mercantile Bank.  Lake Austin purported that Grande Palisades was completely pre-sold.

9.      Other than some infrastructure work, no construction was done at Avalon Resort, Magnolia Woods, and Twin Lakes.  Lake Austin pre-sold units for each of these resort communities and all of those buyer down payments were deposited into the Maesbury Homes account at Mercantile Bank.

10.      H & O was a Florida LLC created by conspirators, known to the grand jury, to purportedly fund approximately $30 million in subordinated debt to Lake Austin that satisfied a shortfall in the required $75 million in borrower equity.

11.      Instant Access Group was an unregistered name used to refer to a group of related companies that included Inside Track Seminars Ltd., Instant Access Properties Ltd., and Fuel Investments Holdings Ltd., which were all United Kingdom PLCs (private limited company). Inside Track Seminars Ltd. offered real estate investment consulting and marketing seminars in Europe.  Instant Access Properties Ltd. provided real estate consulting services and managed the real estate acquisition process to final loan closing for its members or investors.  Fuel

Investments Holdings Ltd. provided the residential mortgages to the buyers working through Instant Access Properties Ltd.

12.     Beginning in approximately October 2003, defendant James Moore created or caused to be created Leadenhall Group Limited in the British Virgin Islands as an international agent or marketer to United Kingdom persons to purchase real estate abroad.  Leadenhall Group Limited was operated through a consulting firm in Switzerland.  Defendant James Moore and another conspirator, known to the grand jury, controlled or were beneficiaries of Leadenhall Group Limited through their involvement with trusts or foundations established in Panama and Isle of Man.  Commissions were paid by foreign developers like one of the conspirators, known to the grand jury, to Leadenhall Group Limited, with some funds then flowing to Instant Access Group.

13.     In approximately June 2004, defendant James Moore created or caused to be created Darrencrest Corporation in the British Virgin Islands to replace Leadenhall Group Limited.  Defendant James Moore and a conspirator, known to the grand jury, controlled or were beneficiaries of Darrencrest through their involvement with trusts or foundations established in Panama and Isle of Man.

14.     Beginning in 2004, Instant Access Properties solicited condominium purchasers for Lake Austin.  In return for each unit sold and the buyer's 25% non-refundable down payment, Lake Austin paid Darrencrest a 10% commission of the condominium's purchase price. The commission payments to Darrencrest were deposited into an account in Geneva, Switzerland.

15.     The condominium down payments ranged from approximately $50,000 - $130,000, for approximately 1,687 investors from the United Kingdom with approximately $159 million deposited into the Maesbury Homes account at Mercantile Bank.  Approximately $58

4

million was then wire-transferred by Lake Austin to the Darrencrest account in Switzerland as commission payments.

*Financial Institutions*

16.     Marshall BankFirst Corporation was a financial services company headquartered in Minneapolis, Minnesota.  It was a bank holding company that included BankFirst and Marshall Financial Group, LLC known as "The Marshall Group."

17.     BankFirst was a financial institution regulated by the Federal Reserve and the deposits of which were insured by the Federal Deposit Insurance Corporation (FDIC) and was headquartered in Sioux Falls, South Dakota.  As part of Marshall BankFirst Corporation, it handled credit functions such as loan origination, loan servicing, loan administration, and risk management.  On or about July 17, 2009, BankFirst failed as a financial institution and was placed into FDIC receivership.  Upon this failure, Outsource Service Management acquired servicing rights for numerous loans, including those made to Lake Austin Properties.

18.     The Marshall Group was an unregulated financial entity that was headquartered in Minneapolis, Minnesota.  As part of Marshall BankFirst Corporation, it provided loan participation and loan syndication opportunities to an extensive network of commercial banks and financial institutions throughout the United States.

19.     Columbian Bank & Trust was headquartered in Topeka, Kansas, with a branch office in Overland Park, Kansas.  It was a financial institution the deposits of which were insured by the FDIC.  On or about August 22, 2008, it failed as a financial institution and was placed into FDIC receivership.  It was one of approximately 68 participant banks that provided participations to BankFirst in 2007 funding the approximate $140 million construction loan for Lake Austin Properties.  Columbian Bank & Trust participated approximately $2.8 million.

20.     First National Bank & Trust Company in Larned, Kansas, was a financial institution the deposits of which were insured by the FDIC.  It was one of approximately 68 participant banks that provided participations to BankFirst in 2007 funding the approximate $140 million construction loan for Lake Austin Properties.  First National Bank & Trust Company in Larned participated approximately $506,000, of which approximately $484,000 was lost.  First National Bank & Trust Company of Larned became the Larned Branch of Farmers Bank & Trust in approximately September 2010.

21.     Citrus Bank was a financial institution the deposits of which were insured by the FDIC.  A conspirator, known to the grand jury, established accounts at Citrus Bank in 2000 for Maesbury Homes.  Citrus Bank was purchased by Mercantile Bank in 2002, and the conspirator known to the grand jury maintained the Maesbury Homes accounts with Mercantile Bank. Mercantile Bank was a financial institution the deposits of which were insured by the FDIC. Mercantile Bank was purchased by T.D. Bank in 2007.

22.     Credit Agricole (Suisse) SA was a financial institution in Geneva, Switzerland. Darrencrest established accounts at Credit Agricole by January 2005.

*Loan Participation*

23.     Participation loans were loans made by multiple lenders, such as Columbian Bank & Trust and First National Bank & Trust Company in Larned, to a single borrower, such as Lake Austin, through an originating financial institution, such as BankFirst.  The originating financial institution typically underwrote the loan, took responsibility for the loan servicing of the participation loan, organized and managed the participants with related loan draws, and directly dealt with the borrower.  In exchange for originating and servicing the loan, the originating financial institution received fees from the participant institutions and the borrower.

6

24.     When the Lake Austin loan for Parcel C closed in April 2007, BankFirst was paid approximately $4.5 million as an origination fee, with almost 10% of that origination fee paid to defendant Eric Johnson.

25.     Before that Lake Austin loan closed in April 2007, BankFirst sold 100% of the approximate $140 million loan to the participant financial institutions.  BankFirst had no financial exposure following closing and was paid monthly asset servicing fees by the participant financial institutions.

*Subordinated Debt*

26.     The Lake Austin loan was closed only because a $30 million subordinated debt from H & O, LLC existed to Lake Austin.  Subordinated debt was an unsecured loan to Lake Austin that upon their default would result in payment to the secured lenders, such as the participant financial institutions, before payment would be made to the unsecured lenders, such as H & O, LLC.

Scheme to Defraud

27.     Beginning on or about December 2, 2003, and continuing through in or about November 2009, the dates being approximate and inclusive, the defendants,

**JAMES MOORE**,
**STEPHANIE LUNDE**,
**ERIC JOHNSON**,
and
**HELEN JONES**,

and conspirators known to the grand jury, devised a scheme to defraud Columbian Bank & Trust, First National Bank & Trust Company in Larned, other participant financial institutions, and individual purchasers of condominium units at Lake Austin; and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.

Manner and Means

7

28.     It was part of the scheme to defraud the purchasers of condominium units at Lake Austin that their down payments were not placed into a traditional escrow account, but rather the account of Maesbury Homes.

29.     It was further part of the scheme to defraud the purchasers of condominium units at Lake Austin that commissions were paid from their down payments to Instant Access Properties/Darrencrest, despite the contracts or sales agreements prohibiting such commissions from the down payments.

30.     It was further part of the scheme to defraud the purchasers of condominium units at Lake Austin that an additional payment for a "rental guarantee" ensured the purchaser's unit would have rental income and that this additional payment would cover the "closing costs" for the purchase of the unit.

31.     It was part of the scheme to defraud the participant financial institutions that the contracts with condominium unit purchasers at Lake Austin prohibited the payment of commissions from their down payments, yet such commissions were paid from the down payments.

32.     It was further part of the scheme to defraud the participant financial institutions that the commissions from the down payments were disguised as "marketing expenses."

33.     It was further part of the scheme to defraud the participant financial institutions that the commissions were paid from the down payments to the Darrencrest account in Switzerland.

34.     It was further part of the scheme to defraud the participant financial institutions that a subordinated debt loan of approximately $30 million was manufactured from H & O, LLC to Lake Austin.

35. It was further part of the scheme to defraud the participant financial institutions that H & O, LLC never had $30 million to lend to Lake Austin Properties and the subordinated debt was concocted to satisfy the requisite $75 million in borrower equity required to successfully participate the loan.

36. It was further part of the scheme to defraud the participant financial institutions that BankFirst personnel including defendants Lunde and Johnson, knew the subordinated debt was false.

37. It was further part of the scheme to defraud the participant financial institutions that BankFirst used $25 million from participant funding of the loan for Parcel C and unit purchasers' deposits to satisfy the outstanding balance due and owing to BankFirst and other participants in the loan for Parcel A.

38. It was further part of the scheme to defraud the participant financial institutions that Lake Austin submitted false financial statements for 2005 to obtain the loan.

39. It was further part of the scheme to defraud the participant financial institutions that BankFirst personnel including defendants Lunde and Johnson, knew Lake Austin submitted false financial statements for 2005 to obtain the loan.

40. It was further part of the scheme to defraud the participant financial institutions that BankFirst personnel including defendants Lunde and Johnson, knew Lake Austin fired their auditors after that accounting firm recalled the opinion on Lake Austin's 2005 financial statements.

41. It was further part of the scheme to defraud the participant financial institutions that BankFirst personnel including defendants Lunde and Johnson, knew that Lake Austin paid commissions to Darrencrest in violation of Florida statutes and the contract with purchasers.

42.     It was further part of the scheme to defraud the participant financial institutions that BankFirst personnel including defendants Lunde and Johnson, knew Lake Austin submitted false financial statements for 2007.

43.     It was further part of the scheme to defraud the participant financial institutions that Lake Austin ignored the loan conditions that, after completion of the outer shells of the towers, it complete all units in C-1 (the first tower) and secure its occupancy certification before proceeding to complete all units in Buildings C-2 and C-3 (the second and third towers).

## COUNT 1

44.     Paragraphs one through forty-three are incorporated as though fully set out herein.

45.     Beginning on or about December 2, 2003, and continuing through in or about November 2009, the dates being approximate and inclusive, in the District of Kansas and elsewhere, the defendants,

**JAMES MOORE**,
**STEPHANIE LUNDE**,
**ERIC JOHNSON**,
and
**HELEN JONES**,

knowingly conspired and agreed together, with each other, and with other persons both known and unknown to the grand jury, to defraud Columbian Bank & Trust, First National Bank & Trust Company in Larned, and other participant financial institutions; and to obtain money, funds, and property owned by and under the custody and control of these financial institutions, by means of materially false and fraudulent pretenses, representations, and promises in violation of Title 18, United States Code, Section 1344.

Overt Acts

10

46.     In furtherance of this conspiracy and to effect and accomplish the objects of it, one or more of the defendants and conspirators, both indicted and unindicted, committed overt acts in the District of Kansas and elsewhere, including the following:

a.     Beginning in 2003, defendant James Moore recruited an individual to act as an agent of Leadenhall Group Limited to identify international properties or developers for marketing those properties or developments to Instant Access Properties members.

b.     On or about December 2, 2003, a conspirator, known to the grand jury, communicated via email to defendant James Moore and the Leadenhall Group Limited agent that he was meeting with another conspirator, known to the grand jury, about the Lake Austin development.

c.     In or about February 2004, a conspirator, known to the grand jury, and the Leadenhall Group Limited agent accompanied another conspirator, known to the grand jury, to meetings with BankFirst about obtaining development financing for Lake Austin.

d.     On or about July 19, 2004, a conspirator, known to the grand jury, noted in Lake Austin's corporate minutes that it had been approached by a marketing firm with a proposal to market the condominiums for Lake Austin to individuals in the United Kingdom in exchange for approximately 50% of the limited partnership interests in Lake Austin.

e.     On or about August 7, 2004, a conspirator, known to the grand jury, signed an Amended and Restated Partnership Agreement for Lake Austin that transferred partial ownership to British Virgin Islands entities owned or controlled by defendant James Moore and another conspirator, known to the grand jury.

f.       On or about April 4, 2005, a conspirator, known to the grand jury, signed an Agency Agreement between Lake Austin and Darrencrest that required Lake Austin to pay Darrencrest a 10% commission for each purchaser of a unit.  This conspirator, known to the grand jury, signed as President of Lake Austin.

g.       On or about May 17, 2005, a conspirator, known to the grand jury, wire-transferred approximately $4,557,185 from the Maesbury Homes account at Mercantile Bank to a Darrencrest account at Credit Agricole in Switzerland.  These funds were deposits from approximately 149 buyers of condominium units for sale by Lake Austin, and represented the 10% commission required under the Agency Agreement between Lake Austin and Darrencrest.

h.       On or about July 12, 2005, a conspirator, known to the grand jury, wire-transferred approximately $138,980 from the Maesbury Homes account at Mercantile Bank to a Darrencrest account at Credit Agricole in Switzerland.  These funds were deposits from approximately six buyers of condominium units for sale by Lake Austin, and represented the 10% commission required under the Agency Agreement between Lake Austin and Darrencrest.

i.       On or about July 22, 2005, a conspirator, known to the grand jury, wire-transferred approximately $2,910,280 from the Maesbury Homes account at Mercantile Bank to a Darrencrest account at Credit Agricole in Switzerland.  These funds were deposits from approximately 72 buyers of condominium units for sale by Lake Austin, and represented the 10% commission required under the Agency Agreement between Lake Austin and Darrencrest.

j.       On or about September 5, 2005, a conspirator, known to the grand jury, signed an Agreement between Lake Austin, Instant Access Properties, and Darrencrest.

12

This Agreement appointed Instant Access Properties as the agent of Lake Austin and Darrencrest to market the sale of condominium units at Lake Austin.

k.      On or about September 7, 2005, a conspirator, known to the grand jury, wire-transferred approximately $217,280 from the Maesbury Homes account at Mercantile Bank to a Darrencrest account at Credit Agricole in Switzerland.  These funds were deposits from approximately seven buyers of condominium units at Lake Austin Properties, and represented the 10% commission required under the Agency Agreement between Lake Austin and Darrencrest.

l.      On or about November 21, 2005, a conspirator, known to the grand jury, wire-transferred approximately $4,916,580 from the Maesbury Homes account at Mercantile Bank to a Darrencrest account at Credit Agricole in Switzerland.  These funds were deposits from approximately 147 buyers of condominium units at Lake Austin, and represented the 10% commission required under the Agency Agreement between Lake Austin and Darrencrest.

m.      On or about January 6, 2006, a conspirator, known to the grand jury, signed a check drawn on the Maesbury Homes account at Mercantile Bank in the amount of approximately $25,000 to start construction on the home of defendant Helen Jones in Kissimmee, Florida.  These funds were deposits from buyers of condominium units at Lake Austin.

n.      By April 2006, defendant Eric Johnson directed another BankFirst employee to prepare the Confidential Information Memorandum for the loan to Lake Austin by Marshall BankFirst.  The Confidential Information Memorandum was the materials provided by BankFirst to the network of participating financial institutions.

13

o.   On or about October 6, 2006, a BankFirst employee, known to the grand jury, altered a chart in the Confidential Information Memorandum to reflect Lake Austin's second source of funds was "subordinated debt" instead of "borrower cash equity."  That BankFirst employee provided this amended chart to defendant Eric Johnson via email for his presentation to the credit committee the following week.

p.   On or about October 18, 2006, defendant Eric Johnson signed the Marshall/BankFirst Commitment Letter to Lake Austin as Senior Vice-President of BankFirst.

q.   The Commitment Letter signed by defendant Eric Johnson identified approximately $28 million in "marketing expenses" budgeted under the "subordinated debt" category.

r.   On or about December 15, 2006, a conspirator, known to the grand jury, signed a check drawn on the Maesbury Homes account at Mercantile Bank in the amount of approximately $296,645.51 payable to the title company for the home of defendant Helen Jones in Kissimmee, Florida.  These funds were deposits from buyers of condominium units at Lake Austin.

s.   On or about March 28, 2007, a conspirator, known to the grand jury, signed a check drawn on the Maesbury Homes account at Mercantile Bank in the amount of approximately $2,500,000 payable to two of the conspirators, known to the grand jury, as "dividends," which generated approximately $87,000 in interest to those two conspirators.  These funds in the Maesbury Homes account were deposits from buyers of condominium units at Lake Austin.

t.   On or about April 3, 2007, a conspirator, known to the grand jury, communicated via email with a BankFirst employee, known to the grand jury, about the

14

documentation supporting the approximate $28 million in "marketing expenses" paid to Darrencrest.

u.      On or about April 26, 2007, defendants Stephanie Lunde and Eric Johnson falsely reported via email to general counsel at BankFirst that they had verified the liquidity, equity, and deposit requirements for Lake Austin in advance of the scheduled closing of the loan.  Specifically, defendants Stephanie Lunde and Eric Johnson knew the condominium unit purchasers' deposits were not held in an escrow account and had been expended for commissions ("marketing expenses") and construction costs, and would be expended for closing costs for this loan.

v.      On or about April 27, 2007, the loan between Lake Austin Properties and BankFirst closed.

w.      In or about December 2007, an accounting firm retained by Lake Austin withdrew its audit opinion for calendar year 2005 financial statements because the commission payments to Darrencrest were in violation of Florida statutes.  In response to this withdrawal, a BankFirst employee working for defendant Eric Johnson directed a conspirator, known to the grand jury, to retain a different accountant.

x.      On or about March 13, 2008, defendant Stephanie Lunde approved the dissemination of a "Participant Update Memo" to the participating financial institutions with the Lake Austin loan.  This Participant Update Memo falsely reported that Lake Austin's 2005 audited financials "may potentially be recalled."

y.      On or about March 25, 2008, defendant Stephanie Lunde communicated to a fellow BankFirst employee that they had not notified participating financial institutions that Lake Austin's accounting firm had "recalled" the audited 2005 financial statements.

15

z.      On or about April 18, 2008, a BankFirst employee working for defendant Eric Johnson specifically communicated to defendant Stephanie Lunde and other BankFirst employees that a conspirator, known to the grand jury, used deposits from condominium unit purchasers to pay marketing expenses/"commission payments."

aa.     On or about January 8, 2009, defendant Stephanie Lunde allowed a subordinate at BankFirst to respond to an inquiry from a participating financial institution that falsely reported the $28 million in marketing expenses was incurred before closing, which was paid by the borrower with equity or by the subordinate lender as "equity or a deferred compensation."  Defendant Stephanie Lunde failed to inform the participating financial institution that a conspirator, known to the grand jury, made commission payments to Darrencrest from the buyer deposits and that the commission payments were disguised as marketing expenses in the Confidential Information Memorandum.

bb.     On or about May 13, 2009, counsel for Lake Austin told defendant Stephanie Lunde that a conspirator, known to the grand jury, paid sales commissions to Instant Access from deposits provided by condominium unit purchasers, yet defendant Stephanie Lunde never informed the participating financial institutions of these payments.

cc.     On or about February 24, 2009, a conspirator, known to the grand jury, falsely stated in an email communication to a condominium unit purchaser that 10% of the unit's purchase price was being held in an escrow account.  That conspirator also falsely stated in that email communication that the amounts of the deposit over 10% had been used in the construction of Lake Austin's infrastructure.

dd.     On or about June 26, 2009, Instant Access Properties sent a video of defendant James Moore to condominium unit purchasers informing them that the Grande

16

Palisades was a fantastic investment or opportunity that would be easy to re-sell and that certificates of occupancy had been issued for Phase I.  Defendant James Moore utilized real estate professionals and British celebrities in the video in an effort to allay the concerns of condominium unit purchasers.

ee.    On or about November 12, 2009, Outsource Service Management filed for foreclosure against Lake Austin, yet defendants James Moore and Helen Jones failed to inform the condominium unit purchasers.

ff.    On or about May 25, 2010, defendant Helen Jones convinced a condominium unit purchaser to remain invested and not request refund of the "escrow deposit" because the purchaser's "rental guarantee" payment would cover the closing costs and the "rental guarantee" would be honored.

gg.    On or about February 22, 2011, defendant Helen Jones sought to convince condominium unit purchasers to contact Lake Austin and alter the unit purchased to one of the units recently completed in the first tower of Parcel C.

hh.    On or about September 9, 2011, defendant Helen Jones communicated to condominium unit purchasers via email that Lake Austin would continue with their project despite some delays.

ii.    As additional overt acts, the Grand Jury incorporates by this reference the allegations set forth in Counts 2 through 19 of the Indictment as though fully set forth at this point.

47.    This was all in violation of Title 18, United States Code, Section 1349.

### COUNTS 2-19

48.    The allegations of paragraphs one through forty-seven are repeated and realleged in Counts 2 through 19, inclusive, of this Indictment, as though fully set forth herein.

17

49.     On or about the dates below, in the District of Kansas and elsewhere, the

defendants,

**JAMES MOORE**,
**STEPHANIE LUNDE**,
**ERIC JOHNSON**,
and
**HELEN JONES**,

along with others known to the grand jury, for the purpose of executing the scheme described

above to defraud the participant financial institutions, and to obtain money, funds, and property

owned by and under the custody and control of those financial institutions, by means of

materially false and fraudulent pretenses, representations, and promises, caused money, funds,

and property to be wired, each instance constituting a separate count with funds wired to

BankFirst in Sioux Falls, South Dakota, in the approximate amount listed below, and including

the approximate amount from the identified financial institutions located in Kansas.

| Count | Date | Total Participant Draw Amount | Kansas Financial Institution | Kansas Participant Draw Amount |
|---|---|---|---|---|
| 2 | March 31, 2008 | $5,031,872.79 | Columbian Bank & Trust | $137,878.09 |
| 3 | March 31, 2008 | $5,031,872.79 | First National Bank & Trust Company in Larned, Kansas | $21,565.17 |
| 4 | April 21, 2008 | $8,274,047.99 | Columbian Bank & Trust | $35,460.21 |
| 5 | April 21, 2008 | $8,274,047.99 | First National Bank & Trust Company in Larned, Kansas | $35,460.21 |
| 6 | May 27, 2008 | $18,324,445.81 | Columbian Bank & Trust | $502,107.21 |
| 7 | May 27, 2008 | $18,324,445.81 | First National Bank & Trust Company in Larned, Kansas | $78,533.34 |
| 8 | July 3, 2008 | $7,819,647.15 | Columbian Bank & Trust | $214,265.75 |
| 9 | July 3, 2008 | $7,819,647.15 | First National Bank & Trust Company in Larned, Kansas | $33,512.78 |
| 10 | August 5, 2008 | $7,889,494.84 | Columbian Bank & Trust | $216,179.65 |
| 11 | August 5, 2008 | $7,889,494.84 | First National Bank & Trust Company in Larned, Kansas | $33,812.13 |
| 12 | September 12, 2008 | $10,139,971.94 | First National Bank & Trust Company in Larned, Kansas | $43,457.02 |
| 13 | October 3, 2008 | $11,211,586.43 | First National Bank & Trust Company in Larned, Kansas | $48,049.66 |

| 14 | November 4, 2008 | $10,929,979.95 | First National Bank & Trust Company in Larned, Kansas | $46,842.78 |
| 15 | December 3, 2008 | $9,364,674.84 | First National Bank & Trust Company in Larned, Kansas | $40,134.32 |
| 16 | December 30, 2008 | $8,208,513.62 | First National Bank & Trust Company in Larned, Kansas | $35,179.35 |
| 17 | February 5, 2009 | $4,687,214.87 | First National Bank & Trust Company in Larned, Kansas | $20,088.07 |
| 18 | March 2, 2009 | $6,474,148.56 | First National Bank & Trust Company in Larned, Kansas | $27,746.35 |
| 19 | April 7, 2009 | $7,508,702.34 | First National Bank & Trust Company in Larned, Kansas | $32,180.16 |

50.     Each was in violation of Title 18, United States Code, Sections 2 and 1344.

## FORFEITURE ALLEGATION

51.     The allegations contained in paragraphs one through fifty of this Indictment are realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 982(a)(2).

52.     Upon conviction of the offenses identified in Counts 1-19 of this Indictment, the defendants,

**JAMES MOORE**,
**STEPHANIE LUNDE**,
**ERIC JOHNSON**,
and
**HELEN JONES**,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2), all property, real and personal, constituting and derived from proceeds obtained directly and indirectly as a result of such violations including, but not limited to, a forfeiture money judgment in the approximate amount of $145,000,000, for which the defendants are jointly and severally liable.

53.     If any of the property described above, as a result of any act or omission of the defendants:

a.     cannot be located upon the exercise of due diligence;

19

b.      has been transferred or sold to, or deposited with, a third party;

c.      has been placed beyond the jurisdiction of the court;

d.      has been substantially diminished in value; or

e.      has been commingled with other property that cannot be divided without

difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

forfeit substitute property of the defendants.

54.      This was all pursuant to Title 18, United States Code, Section 982(a)(2).

A TRUE BILL.

Dated:  December 21, 2016                        s/Foreperson_____
                                                 FOREPERSON


s/ Scott C. Rask, #15643 for_____
THOMAS E. BEALL
United States Attorney
District of Kansas
500 State Ave., Suite 360
Kansas City, KS 66101
(913) 551-6730
(913) 551-6541 (fax)
thomas.beall@usdoj.gov
Ks. S. Ct. No. 19929

(It is requested that trial of the above captioned case be held in Kansas City, Kansas.)

**PENALTIES:**

Ct. 1:        18 U.S.C. § 1349
              Bank Fraud Conspiracy

- NMT 30 years imprisonment
- NMT $1,000,000 fine
- NMT 5 years supervised release
- $100 special assessment
- Forfeiture Allegation

Cts. 2-19:    18 U.S.C. § 1344
              Bank Fraud

- NMT 30 years imprisonment
- NMT $1,000,000 fine
- NMT 5 years supervised release
- $100 special assessment
- Forfeiture Allegation